**WILCOX v. EMMONS et al.**

**No. 5189–PH.**

District Court, S. D. California, Central Division.

July 29, 1946.

A. L. Wirin, of Los Angeles, Cal., for plaintiff.

Charles H. Carr, U. S. Atty., and Mildred Kluckholm, Asst. U. S. Atty., both of Los Angeles, Cal, for defendants.

HALL, District Judge.

This case involves the powers of the Commanding General of the Western Defense Command under Executive Order Feb. 19, 1942, No. 9066, C.F.R. Tit. 3, p. 1092 Cum.Supp; 7 R.F. 1407, and Law 503, 56 Stat. 173, 18 U.S.C.A. § 97a.

On September 6, 1943, the plaintiff was seized in his home in California and ejected by the use of physical and military force from the State of California by a squad of soldiers acting under the orders of the defendant Commanding General of the Western Defense Command, and was thereafter excluded from the State of California for several months, for which he seeks damages in this action.

The ejectment and exclusion were done under an Order directed to the plaintiff, individually, excluding him from Military Areas Numbers 1 and 2 which included among other areas the entire State of California. The defendant, General De Witt, is the only defendant who has appeared. Service has been had upon none of the other defendants, nor have they voluntarily appeared as did General DeWitt.

The defendant, General De Witt, filed a motion for summary judgment under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Thereafter the plaintiff filed a similar motion.

Both motions were noticed and heard together. All matters have been extensively argued and briefed. While subdivision (c) of Rule 56 permits judgment, if "there is no genuine issue as to any material fact" (except as to the amount of damages); and while subdivision (d) requires an order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy," it is nevertheless necessary to ascertain what the material facts are, and what material facts exist without "substantial controversy" or "genuine issue" before either a final or partial judgment can be rendered.

This is especially true where, as here, the matters involved cover not only the record of the previous case, but also involve so many facts which must be judicially noticed.

After the arguments and after briefs were filed, the parties were requested to file statements of their contentions as to what material facts existed without substantial controversy or genuine issue.

From these statements and the evidence, records and files in the case, I now find the following facts to be material and to exist without substantial controversy or genuine issue:

1. On December 8, 1941, Congress declared war upon Japan, 55 Stat. p. 795, 50 U.S.C.A.Appendix, note preceding section 1. Said Statute is now and ever since said date has been in full force and effect.

2. On December 11, 1941, the Western Defense Command was created within the War Department which included the whole of the States of Washington, Oregon, California, Arizona, Montana, Idaho, Utah, and Nevada, and on the same date the defendant herein, Lt. General John L. De Witt, was designated as Commanding General of the Western Defense Command.

3. On December 11, 1941, the Western Defense Command was designated by military authorities as a theater of military operations. Such a theater is defined as an area necessary for military operations and the administration and supply incident to military operation. The zone closest to the enemy which is required for the actual operation of the combatant forces is designated as a combat zone. The rear area of a theater of operations is known as a zone of communication, in which supply and administrative troops function to provide necessary service for the combat forces. The coastal area of the coastal states of Washington, Oregon, and California was a combat zone, and the remaining area of the Western Defense Command was a zone of communication.

4. On December 12, 1941, Executive Order 8972, 3 CFR Cum.Supp. p. 1038, was promulgated and was in full force and effect at all times herein mentioned. It authorized the Army and Navy to establish and maintain military guards and patrols, or by other appropriate means to protect "national-defense material" "na-

tional-defense premises" and "national-defense utilities."

5. On February 14, 1942, the defendant as Commanding General of the Western Defense Command made a report and recommendation to the Secretary of War concerning the "Evacuation of Japanese and Other Subversive Persons From The Pacific Coast" (Final Report Japanese Evacuation From The West Coast, by General De Witt, U. S. Government Printing Office), in which he recommended, among other things, (p. 36) that an Executive Order be procured for, "authority to designate military areas in the combat zone in the Western Theater of operations (if necessary to include the entire combat zone), from which, in his discretion, he may exclude all Japanese, all alien enemies, and all other persons suspected for any reason by the administering military authorities of being actual or potential sabotuers [sic] espionage agents, or fifth columnists," and that such legislation be "implemented by the necessary legislation imposing penalties for violation."

6. February 19, 1942, the President promulgated Executive Order No. 9066 as follows:

"Authorizing the Secretary of War to Prescribe Military Areas

"Whereas, the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1916, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U.S.C. Title 50, Sec. 104):

"Now, Therefore, By virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which

any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restriction the Secretary of War or the appropriate Military Commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary, in the judgment of the Secretary of War or the said Military Commander, and until other arrangements are made, to accomplish the purpose of this order. The designation of military areas in any region or locality shall supersede designations of prohibited and restricted areas by the Attorney General under the said Proclamations of December 7 and 8, 1941, and shall supersede the responsibility and authority of the Attorney General under the said Proclamations in respect of such prohibited and restricted areas.

"I hereby further authorize and direct the Secretary of War and the said Military Commanders to take such other steps as he or the appropriate Military Commander may deem advisable to enforce compliance with the restrictions applicable to each Military area hereinabove authorized to be designated, including the use of Federal troops and other Federal agencies, with authority to accept assistance of state and local agencies.

"I hereby further authorize and direct all Executive Departments, independent establishments and other Federal Agencies, to assist the Secretary of War or the said Military Commanders in carrying out this Executive Order, including the furnishing of medical aid, hospitalization, food, clothing, transportation, use of land, shelter, and other supplies, equipment, utilities, facilities, and services.

"This order shall not be construed as modifying or limiting in any way the authority heretofore granted under Executive Order No. 8972, dated December 12, 1941, nor shall it be construed as limiting or modifying the duty and responsibility of the Federal Bureau of Investigation, with respect to the investigations of alleged

acts of sabotage or the duty and responsibility of the Attorney General and the Department of Justice under the Proclamations of December 7 and 8, 1941, prescribing regulations for the conduct and control of alien enemies, except as such duty and responsibility is superseded by the designation of military areas hereunder."

"Franklin D. Roosevelt

"The White House, February 19, 1942."

7. On February 20, 1942, the Secretary of War sent a letter to the defendant and enclosed a copy of said Executive Order and designated the defendant "as the military commander to carry out the duties and responsibilities imposed in the Western Defence Command, including such changes in the prohibited and restricted areas heretofore designated by the Attorney General as you deem proper to prescribe" and giving him other instructions. (For text of letter see De Witt's Report, pages 25, 26.) On the same day, to wit, February 20, 1940, the Assistant Secretary of War forwarded a memo to the defendant as Commanding General which contained an outline of the suggested method of procedure which might be followed in carrying out an evacuation program. (For full text, see De Witt's Report, pages 27, 28, 29.)

8. Immediately upon the promulgation of Executive Order No. 9066, the War Department, with the approval of the President, requested the Congress to enact legislation to provide sanctions for the enforcement of directives issued under the authority of the Executive Order. A draft of proposed legislation for this purpose was transmitted by the Secretary of War simultaneously to the Chairman of the Senate Military Affairs Committee, and to the Speaker of the House of Representatives. The concurrence of the Department of Justice as to the form and substance of the bill had been obtained. (P. 29 De Witt Rep.)

The body of such letter of transmittal from the Secretary of War to the Congress read as follows:

"There is enclosed herewith draft of a bill entitled 'a bill to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, or leaving military areas or zones,' which the War Department recommends to be enacted into law.

"The purpose of the proposed legislation is to provide for enforcement in the Federal criminal courts of orders issued under the authority of Executive Order of the President No. 9066, dated February 19, 1942. This Executive Order authorizes the Secretary of War to prescribe military areas from which any and all persons may be excluded for purposes of national defense.

"It is impossible to estimate the probable cost to the Government consequent upon the enactment of such legislation.

"The Bureau of the Budget has advised that there is no objection to the submission of this proposed legislation for the consideration of the Congress, as the enactment thereof would not be in conflict with the program of the President."

While the legislation was under consideration, the Secretary of War, on March 14, 1942, transmitted another letter to the Congress suggesting an amendment and urging immediate enactment. The letter of March 14th is as follows:

"Hon. Andrew J. May,

"Chairman, Committee on Military Affairs,

"House of Representatives.

"Dear Mr. May:

"By telephone on Thursday, March 12, 1942, Lt. Gen. John L. DeWitt, commanding in the Western Defense Command, requested that action be taken to expedite passage of S. 2352 and H. R. 6758, bills to provide penalties for violation of restrictions or orders with respect to persons entering, remaining in, or leaving military areas or zones.

"General DeWitt is strongly of the opinion that the bill, when enacted, should be broad enough to enable the Secretary of War or the appropriate military commander to enforce curfews and other restrictions within military areas and zones. To that end, it is suggested that in line 3, page 1, of H. R. 6758 the word 'or' be stricken and that after the word 'leave'

there be inserted the words, 'or commit any act in.'

"General DeWitt indicated that he was prepared to enforce certain restrictions at once for the purpose of protecting certain vital national defense interests but did not desire to proceed until enforcement machinery had been set up.

"The War Department recommends immediate passage of the proposed law.

"Sincerely yours,

"Henry L. Stimson
"Secretary of War."

(Pp. 29, 30, De Witt Report)

9. By Proclamation No. 1, dated March 2, 1942, Lt. Gen. John L. De Witt created Military Areas Nos. 1 and 2, upon the finding that the Pacific Coast was particularly subject to attack and attempted invasion by the armed forces with which the United States was at war, and in connection therewith, was subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such military operations. Military Areas Nos. 1 and 2, as then defined, included the states of Oregon, Washington, California, and Arizona. Area No. 1 included approximately the same area as the said combat zone.

10. On March 20, 1942, Congress enacted and on March 21, 1942, the President approved Public Law 503 entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones." It read as follows:

"Public Law No. 503

"To provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense."

11. Subsequent thereto the defendant Commanding General sought and obtained the passage of numerous Municipal and County Ordinances and in some instances State Laws, making it an offense to violate orders promulgated under the authority of Executive Order 9066.

12. On July 2, 1942, the Secretary of War addressed a letter to the Commanding General of the Western Defense Command and Fourth Army in words and figures as follows:

"War Department
"Washington
"July 2, 1942

"The Commanding General
"Western Defense Command and Fourth Army
"Presidio of San Francisco
"California

"Sir:

"By virtue of the authority vested in me as Secretary of War, and pursuant to the provisions of Executive Order 9066, issued and published February 19, 1942, by the President of the United States. I do hereby authorize and direct you as the designated Commanding General of the Western Defense Command and Fourth Army to exclude from Military Areas Nos. 1, 2, 3, 4, 5, and 6 of the Western Defense Command, as defined in Proclamations Nos. 1 and 2, your headquarters, any and all persons whether alien or citizen whose presence therein is determined by you to be inimical to the national security.

"All orders for the exclusion of any such person shall contain a provision pro-

hibiting any such excluded person from entering into or upon any of the several Military Areas prescribed by the designated Commanders of the Southern Defense Command and of the Eastern Defense Command.

"You are further authorized and directed to provide, or cause to be provided, medical aid, hospitalization, food, clothing, transportation, use of land, shelter, supplies, equipment, utilities, facilities and services to such excluded persons within and without the Western Defense Command as may be necessary in your judgment to accomplish the purpose of this order or of any exclusion order published by you.

"/s/ Henry L. Stimson
"Secretary of War"

13. On July 15, 1942, the Secretary of War addressed a communication to the defendant Commanding General in words and figures as follows:

"War Department
"Washington
"July 15, 1942

"Dear General De Witt:

"I refer to Executive Order of the President No. 9066 dated February 19, 1942 and to your designation as a Military Commander for the Territory of the United States embraced within Western Defense Command to carry out the duties and responsibilities imposed by the mentioned Executive Order and authorizing and empowering you to take whatever steps may be necessary to discharge those duties and responsibilities.

"In order effectively to accomplish the exclusion from Military Areas of the Western Defense Command and from other similar areas, of persons whose presence therein is deemed dangerous to the national security, you are further authorized and empowered within the scope of the cited Executive Order, to prohibit any or all of such persons that is, persons who have been excluded by you from any military area of the Western Defense Command, from entering, being in or remaining in any other Military Areas of the United States prescribed pursuant to said Executive Order, including the Eastern Military Area in Eastern Defense Command and the Military Areas of the Southern Defense Command.

"/s/ Henry L. Stimson
"Secretary of War"

13. (a) From the date of the declaration of the war, and until the recission of the Exclusion Order against plaintiff on March 22, 1944, there was a continued threat of external enemy attack by land, sea and air on the Pacific Coast, which was particularly in danger of hit-and-run attacks, Commando type raids, and enemy raids conducted for the purpose of destroying and disrupting Pacific Coast war industries. Sabotage and espionage in connection with such attacks were reasonably anticipated. The length of the coast line of Military Area No. 1 was a fact to be considered in estimating the possibility of such attacks being attempted and the precautions which must reasonably be taken to guard against them. At least six attacks by sea and air were made on or off the Pacific Coast by the enemy. Later 9,000 free balloons, carrying high explosives and incendiaries, were launched by the Japanese against the West Coast, and it is estimated that some 194 were actually found.

14. Within Military Areas Nos. 1 and 2, and during the period last above mentioned, there was a large concentration of national defense material, premises and utilities, consisting of strategic Army and Navy installations and establishments, aircraft contracts being performed in the country, shipyards constructing a large portion of the ships being built in the United States, and many other plants producing vital war material, and vast timber resources which are of vital importance in the construction of war materials. Many thousands of troops were conducting maneuvers within Military Areas Nos. 1 and 2, and troops and supplies in large numbers and amounts were sailing for the ports of the Pacific Coast. Large portions of national defense resources and utilities were located in Military Areas Nos. 1 and 2. The manufacture of military supplies, the movement of ships, men and materials

from the Pacific Coast ports to the Pacific battle fronts, and the use of California ports by Naval vessels for repair and outfitting, presented a likelihood of espionage and sabotage which made the prevention of sabotage and espionage within Military Areas Nos. 1 and 2 a matter of military necessity.

15. That plaintiff is a native-born citizen of the United States, and for five years prior to September 6, 1943, he was a resident of the City of San Diego, State of California.

16. It was General De Witt's responsibility to select the procedure by which he would determine to exclude or not to exclude potentially dangerous persons from the said military areas. The Individual Exclusion Procedure adopted by General De Witt was expressly approved by the Secretary of War as were any amendments to the said procedure. The procedure so adopted and approved was specifically designed to meet the problem of removing from the sensitive areas of the Western Defense Command those persons whose presence within the said military areas would present a danger of espionage and sabotage. The removal of such persons was ordered and undertaken solely for the purpose of preventing the anticipated dangers from materializing.

17. The general overall procedure followed by the Western Defense Command in making individual exclusion orders, except for changes from time to time which were minor, was as follows:

First: The gathering, summarizing, analyzing and evaluation of intelligence and investigative reports from military, naval, and civil agencies by the Civil Affairs Division of the Western Defense Command, which data is reviewed by the Civil Affairs Division personnel, and then by the officers in charge of the Civil Affairs Division who recommend for or against exclusion to the Commanding General.

Second: Review by Commanding General who may determine on non-exclusion or exclusion, in which latter event the subject is notified of his exclusion, and also notified he may have a hearing be-

fore a special Board of Officers, designated Individual Exclusion Hearing Board. In the notice of hearing there is set forth a list of things upon which special inquiry is to be made and the subject is notified he will be allowed to present witnesses.

Third: Hearing before the Individual Exclusion Hearing Board composed of three high ranking officers selected by the Commanding General, at which hearing the subject may present evidence and witnesses, but is not confronted with witnesses against him nor allowed to examine the file concerning him. The Board then makes written findings and recommendations which together with a transcript of testimony is transmitted again to the Civil Affairs Division.

Fourth: Civil Affairs Division again reviews, summarizes and analyzes entire file and the Officer in Charge makes his final recommendations for or against exclusion and again transmits it, together with entire file, to the Commanding General.

Fifth: After study of entire file Commanding General orders non-exclusion or issues order of exclusion which is transmitted to the subject. This order is final, except for periodic review.

18. On October 18, 1942, Assistant Chief of Staff of the Western Defense Command advised Assistant Chief of Staff, Civil Affairs Division, Western Defense Command, that from all the information available from the files of the Federal Bureau of Investigation, Office of Naval Intelligence, and of his own office, he was of the opinion that plaintiff should be excluded from the Western Defense Command; that, as a result, the Civil Affairs Division reviewed the G–2 File on plaintiff and recommended that he appear before an Individual Exclusion Hearing Board for the purpose of determining if military necessity required the exclusion of the plaintiff from military areas.

19. That pursuant to said recommendation of the Civil Affairs Division of the Western Defense Command, plaintiff, on or about October 26, 1942 was served with a summons in the words and figures as follows:

"Plaintiff's Exhibit No. 1

"Headquarters Western Defense Command and Fourth Army

"Individual Exclusion Hearing Board

"Presidio of San Francisco, California

"October 26, 1942

"To: Homer Wilcox,

"1716 Union St., San Diego, California.

"1. You are hereby notified that a Board of Officers has been appointed by the Commanding General, Western Defense Command and Fourth Army, to consider the question whether military necessity requires the issuance of an order excluding you from certain Military Areas of the Western Defense Command and similar areas prescribed pursuant to Executive Order 9066, dated February 19, 1942, Public Proclamations Nos. 1 and 2, this headquarters dated March 2, 1942, and March 16, 1942, respectively, and special instructions of the Secretary of War.

"2. You are further notified that on Tuesday the 3 day of November, 1942, at the hour of 3:00 P. M., this Board will be convened at Room 935, Bank of America Bldg., San Diego, California, and that you may, if you so elect, appear before it at that time for the purpose of being informed of the general nature and scope of the inquiry and afforded an opportunity to present evidence in your own behalf and to answer questions or make a statement under oath or affirmation. Material in the hands of the Board will not be made available for your inspection.

"3. It is requested that you advise the Board, in writing, at least 24 hours in advance of the hearing whether you will appear.

"4. For your information and guidance the following are pertinent regulations concerning the conduct of this investigation;

"a. All matters pertaining to the inquiry are confidential and no publicity will be given them by the Board.

"b. Your appearance before this Board is optional on your part.

"c. You may be accompanied by counsel to act only as your personal advisor. He will not be heard by the Board nor permitted to examine witnesses. In general, the interrogation of witnesses will be conducted by the Recorder, on behalf of yourself and the Board.

"d. You may refuse to answer any questions asked by the Board, without assigning any specific reason for your refusal.

"e. Any evidentiary statements by you before the Board must be under oath or affirmation.

"f. This inquiry by the Board is in no sense a criminal proceeding; you are not charged herein with the commission of any penal offense. For your information, Congress has by the enactment of Public Law 503, 77th Congress, approved March 21, 1942, provided penalties for the violation of an order of exclusion. The act in question reads as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000.00 or to imprisonment for not more than one year, or both, for each offense."

"Frank A. Meek
"Lt. Col. F. A.
"President"

20. That at the time said summons was served on plaintiff, a questionnaire was served on him, which advised him that the information requested therein would be helpful to the Board for determining whether plaintiff should be excluded, which questionnaire plaintiff completed voluntarily and filed with the Board at the time he appeared before it; that said questionnaire contained information relating to his background, association, and activities.

348

21. That in accordance with the summons aforesaid, the Board of Officers, all of whom were attached to the Western Defense Command and under the command of defendant, Lt. General De Witt, convened at San Diego, California, on November 3, 1942, before whom plaintiff appeared in response to said summons with his counsel and two friends. At the outset of the hearing one of said officers who acted as President of the Board read to plaintiff a statement similar to the contents of the summons theretofore served upon him and advised him what the Board was concerned with and extended to him an opportunity to testify and to adduce other evidence "if you wish, in regard to your background, associations and activities in substance as follows: (a) your birthplace, education, occupation, military service, citizenship, marital status and family background; (b) the circumstances surrounding your membership in Mankind United and "the nature of your duties and activities arising out of your position as Bureau Manager for Mankind United." Plaintiff appeared at said time and place and submitted to interrogation under affirmation. Two witnesses who accompanied plaintiff were not permitted to enter the hearing room, nor be present at the hearing, but plaintiff's attorney was permitted to be present at the hearing, although not permitted to conduct any interrogation of witnesses other than the plaintiff.

Thereafter at the conclusion of said hearing the said Board of Officers as a result of said hearing on November 3, 1942, made the following findings and recommendations to the Commanding General through the Assistant Chief of Staff, Civil Affairs Division:

"The Board having carefully considered the evidence before it finds:

"That he is a native born American citizen, having been born in Somerton, Belmont County, Ohio, on December 21, 1887.

"That he was vague, indefinite and evasive concerning his marriage but says he has a son now twenty-nine years of age, from whom he has not heard for the past ten years.

"That he is the manager of the local 'Beacon' in San Diego, California, of an organization known as 'Mankind United.'

"That this organization is religious in character, and he, as the manager of the local branch is in what might be termed a 'religious racket'. The Board is convinced from the testimony that he is a 'religious hypocrite' using his organization as a means of extricating money from the unwary and credulous, under the guise of religion.

"That he has no connections, contacts or communication with any person known to be subversive, or having subversive tendencies.

"That he was diffident, vague and indefinite in the manner in which he gave his testimony in answer to many questions propounded by the Board, and this was undoubtedly based upon a fear that he might be prosecuted for his so-called 'religious activities'.

"That the file contained no information that he ever taught, preached or spoke against the best interests of the United States, or that he ever advised any of the 'members' of his organization to violate the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq.

"That he is erratic and egotistical, and can very well be termed a 'crack-pot.'

"While a majority of the Board do not sympathize with his manner of earning a living and while it is suspicious of his activities, and feels that he may have transgressed against the law in his preaching, nurturing and fostering of the religious organization known as 'Mankind United,' nevertheless, this does not render him potentially dangerous to the military efforts of the United States, and he therefore should not be excluded.

"Recommendations:

"In view of the above findings the Board recommends:

"1. That no Order of Exclusion be entered against Homer Glen Wilcox."

23. On November 13, 1942, the United States Attorney for the Southern District of California advised the Western Defense Command that he had reviewed the pro-

ceedings had at the Exclusion Hearing by the above mentioned Board concerning the plaintiff and dissented from the Recommendations of the Board, and recommended that further investigation should be made of the subject.

24. On November 24, 1942, the officers who constituted the Board which conducted the hearing on November 3, 1942, as heretofore set forth, addressed the following communication to the Western Defense Command:

"Western Defense Command and Fourth Army

"Wartime Civil Control Administration

"Office of the Director

"1231 Market Street

"San Francisco, California

"24 November 1942

"201–Wilcox, Homer C.     (Civ.)

"Case No. V–7

"Subject: G–2 Memorandum 'Mankind United'

"dated November 21, 1942.

"To: Assistant Chief of Staff. CAD.

"1. The Individual Exclusion Hearing Board heard the case of Homer G. Wilcox, Case No. V–7, at San Diego, California, on November 3, 1942, and thereafter prepared its findings and recommendations in which no exclusion was recommended.

"2. On or about November 21, 1942, on the return of the Board to San Francisco, the above-mentioned memorandum prepared by G–2 Section, with attachments, was delivered to the Board.

"3. The Board has carefully considered this memorandum. It has reconsidered the entire file and the evidence adduced at the original hearing, and it is still of the same opinion that no exclusion order should be issued in this case. And, the Board still feels that Wilcox is a harmless 'crack-pot' interested in this organization purely for financial reasons. Attention is directed to paragraphs 10 of the above mentioned memorandum which indicates that the F. B. I. is investigating the members of 'Mankind United' for mail fraud.

"4. It is worthy of mention that Mr. Hood, Special Agent in Charge of the Los Angeles office of the F. B. I. on November 8, 1942, informed the then President of the Individual Exclusion Hearing Board that the F. B. I. was presenting evidence against all of the leaders of 'Mankind United' looking toward indictments for using the mails to defraud, and he indicated strongly that 'Mankind United' was a money-making racket."

"Frank E. Meek,
"Lt. Col. F. A.
"Harry N. Deyo,
"Lt. Col., J. A. G. D.
"Colbert C. McClain,
"Lt. Col., F. A."

25. That the Administrative file of the Western Defense Command discloses that on December 17, 1942, plaintiff, together with other persons connected with Mankind United was indicted by the Federal Grand Jury for the Southern District of California for a violation of Section 34, U.S.C.A.; Title 50 (Conspiracy to Commit Sedition).

26. In conformity with the procedure established and customarily followed by the Western Defense Command with respect to Individual Exclusion cases, which was set up by the Commanding General of the Western Defense Command, the various reports of the Federal Intelligence Agencies of the United States Government, based upon investigations conducted, relating to plaintiff's activities, which become a part of the Administrative File of the Western Defense Command of Homer Glen Wilcox, the findings and recommendations of the Board, the recommendations of the United States Attorney for the Southern District of California, and the recommendation of the Assistant Chief of Staff, G–2 of the Western Defense Command were reviewed by the Civil Affairs Division of the Western Defense Command, and on December 21, 1942, the Assistant Chief of Staff of the Civil Affairs Division of the Western Defense Command recommended to defendant Lt. Gen. John L. De Witt that an Individual Exclusion Order be issued against plaintiff; that the United States Attorney for the Southern District of California concurred in the recommendation

that plaintiff be excluded from the military areas; that ultimately such findings and recommendations, and the entire Administrative File of plaintiff were submitted to the Commanding General. The function of the Board of Officers and that of staff sections and officers passing upon plaintiff's exclusion case was advisory only and was for the purpose of advising the Commanding General as to whether or not those individuals whose cases they reviewed should be excluded.

27. Thereafter, on December 28, 1942, after a study of the Reports of Intelligence Agencies of the United States Government concerning plaintiff, the entire Administrative File of Homer Glen Wilcox, the information received from the questionnaire filed by plaintiff with the Board, the testimony of the Board hearing on November 3, 1942, the appraisals and recommendations made by the Board, by other staff sections and officers, and by the United States District Attorney for the Southern District of California, defendant, Lt. Gen. John L. De Witt issued Exclusion Order V–7, which order was in words and figures as follows:

"Headquarters Western Defense Command and Fourth Army
"Presidio of San Francisco, Calif.
"Individual Exclusion Order
"Dec. 28. 1942
"No. V–7

"To: Homer Glen Wilcox
"1716 Union Street
"San Diego, California

"Under authority of Executive Order No. 9066, February 19, 1942 and letter of the Secretary of War, February 20, 1942, and pursuant to a determination that the present action is dictated by military necessity, you are hereby prohibited, after the expiration of ten days from 12:00 o'clock midnight of the day you receive this order, from being in, remaining in or entering into Military Areas Nos. 1 and 2 (comprising the State of Arizona, California, Oregon and Washington), Western Defense Command, as established by Public Proclamations Nos. 1 and 2, this headquarters, dated March 2, 1942, and March 16, 1942, respectively, and any amendments thereto.

This proclamation extends to any zones or areas which may hereafter be similarly designated, defined and established, but as to such additional zones or areas a period of ten days from and after the date of the proclamation establishing such additional zones or areas is permitted you to comply with this prohibition. This prohibition shall continue in force until revoked in writing by proper authority.

"Under authority of Executive Order No. 9066, February 19, 1942, and letter of the Secretary of War, July 15, 1942, and pursuant to a determination that the present action is dictated by military necessity, you are also hereby prohibited from entering into, being in, or remaining in, at any time from and after midnight of the date upon which you receive this order, Eastern Military Area, comprising the States of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, North Carolina, South Carolina, Georgia, the District of Columbia and part of the State of Florida, as defined and designated by Proclamation No. 1, dated May 16, 1942, Headquarters Eastern Defense Command and First Army, Governors Island, New York, H. A. Drum, Lieutenant General, U. S. Army, Commanding, and from entering into, being in, or remaining in, from and after said time and date, Military Area No. 1 of Florida Military Area No. 1 of Alabama, Military Area No. 1 of Mississippi, Military Area No. 1 of Louisiana, Military Area No. 1 of Texas, and Military Area No. 1 of Mexico, as defined and designated by Public Proclamation No. 1, dated May 30, 1942, Headquarters, Southern Defense Command, San Antonio, Texas, Walter Krueger, Lieutenant General, U. S. Army Commanding.

"Within forty-eight hours after service upon you of this order you are required to report in person to a representative of this headquarters at such place as may be designated by the person serving this order, to make arrangements for compliance herewith, and at that time have your photograph, finger prints and a specimen signature taken.

"Prior to your departure in compliance herewith you will communicate in writing to Wartime Civic Control Administration, Western Defense Command and Fourth Army, 1231 Market Street, San Francisco, California, the time of your proposed departure, initial and ultimate destinations, route to be followed and mode of travel; upon arrival at ultimate destination, you will, in person report the fact of your arrival and your address at such destination to the Special Agent-in-Charge of the nearest office of the Federal Bureau of Investigation, Department of Justice.

"Failure to comply with the foregoing will subject you to the criminal penalties provided by Public Law No. 503, 77th Congress, approved March 21, 1942, entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones."

"/s/  J. L. DeWITT (typed)
"J. L. DeWITT (printex)
"Lieutenant General U. S.
"Army
"Commanding."

28. At no point in any of the proceedings before the said Board or the other military agencies or officers or the United States Attorney was the plaintiff afforded an opportunity to cross-examine witnesses, or to know the source or content of the information against him upon which any of said officers or persons were relying, nor was he afforded any opportunity to meet such adverse information nor was he permitted to know the name of informants against him.

29. Said Individual Exclusion Order V–7 was served on plaintiff on January 22, 1943. At the same time plaintiff was served with another document, a "Stay Order," dated January 14, 1943, modifying and staying the original Order V–7, permitting him to remain in Military Areas Nos. 1 and 2 under certain security conditions, and requiring him to leave the said areas at the conclusion of the trial of Criminal Case No. 15758, which order was in words and figures as follows:

"Headquarters Western Defense Command
and Fourth Army
"Presidio of San Francisco, Calif.
"Office of the Commanding General
"January 14, 1943
"201-Wilcox, Homer
"No. V–7

"To:  Homer Wilcox
"1716 Union St.,
"San Diego, Calif.

"The United States Attorney for the Southern District of California has informed the Commanding General, Western Defense Command and Fourth Army, that a felony charge of sedition has been filed against you, that arraignment on this charge is set for January 18, 1943, and that the trial date is March 16, 1943, at Los Angeles.

"Permission is hereby given for you to remain in the military areas of the Western Defense Command from which you have been excluded only until the trial is concluded, irrespective of whether Judgment is reached or an appeal taken. Such permission is granted upon the following conditions:

"a. That immediately upon receipt of this letter, you report in person to the Special Agent-in-Charge, Federal Bureau of Investigation, at San Diego or Los Angeles, and inform him of the place at which you will reside during the continuance of your presence in the said Western Defense Command military areas under this conditional permit;

"b. That while within those military areas from which you have been excluded, you are to remain at your place of residence between the hours of 8:00 P. M. and 6:00 A. M., and at all other times, in the absence of special permission obtained from this headquarters, you are to remain within a distance of not more than five miles from your place of residence;

"c. That nothing in paragraph b, above shall be construed to prohibit you from visiting your legal counsel, the United States Attorney at Los Angeles, or the Special Agent-in-Charge, Federal Bureau of Investigation, at San Diego or Los Angeles, for the purpose of transacting

any business, or of making any arrangements necessary for your defense to said action;.

"d. That while within the "prohibited areas" you are to report in person semi-weekly to the Special Agent-in-Charge, Federal Bureau of Investigation, at San Diego or Los Angeles;

"e. That you depart from said Western Defense Command military areas from which you have been excluded immediately upon the conclusion of your trial unless you are in confinement by federal authority. If you are thereafter released from such confinement, you will immediately so depart. Prior to such departure, you will report in person to the Special Agent-in-Charge, Federal Bureau of Investigation, at San Diego, and notify him of the hour and date of your departure from San Diego, your destination, your route and means of travel. Upon arrival at your destination you will immediately notify, by telegram, the Special Agent-in-Charge, Federal Bureau of Investigation, at San Diego;

"f. That you travel from San Diego to your destination outside the military areas from which you have been excluded, by the most direct route available, and by common carrier; and

"g. The provisions of the Individual Exclusion Order by which you are excluded from certain military areas remain in full force and effect, and are temporarily modified only to the extent of the special permission granted to you hereby to remain in a portion of said areas for the sole purpose of defending yourself on this charge of sedition.

"Failure to comply with the terms of the Individual Exclusion Order, as modified by the aforementioned conditions, will subject you to the penalties of Public Law 503, 77th Congress, approved March 21, 1942, entitled 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.'

"You will acknowledge receipt of this memorandum on the duplicate copy hereof in the place provided therefor and you will return it to these headquarters in the self-addressed and postage-free envelope provided for your convenience.

"(Signed)    J. L. DeWITT
    "J. L. DeWITT
"Lieutenant General, U. S. Army
    "Commanding."

30. On March 25, 1943, plaintiff filed a complaint in the United States District Court for the Southern District of California at Los Angeles, entitled: "Homer Glen Wilcox, plaintiff, v. Lt. General John L. De Witt, Lt. Colonel Frank E. Meek, Lt. Col. Colbert C. McClain, Lt. Col. Harry N. Dayo, H. Hathan, L. A. Ducommon and F. C. Dorwart, Defendants," initially numbered 2827–PH Civil and finally designated No. 283 S.D.Civ. Said complaint contained two causes of action. By the first cause of action, the plaintiff Wilcox claimed that the Exclusion Order V–7 of December 28, 1942 (paragraph 27 hereof), and that the Stay Order of January 14, 1943 (paragraph 29 hereof), were both void as being in violation of the Constitutional rights of the plaintiff under the First and Fifth Amendments to the U. S. Constitution.

31. It was alleged in paragraph XIV thereof that "the defendants have since January 22, 1943, enforced and are enforcing said orders at the present time; and they have threatened and they intend to, carry out and enforce said orders and each of them; and will unless restrained from so doing by order of this Court carry out and execute each of said orders."

32. By the Second Cause of Action in said complaint plaintiff sought damages asserting that (Paragraph I) "the acts of defendant in issuing and enforcing the orders aforesaid were committed maliciously, wantonly, oppressively and in a reckless disregard of the rights of plaintiff, by virtue whereof the plaintiff is entitled to punitive damages" and in Paragraph II, "that plaintiff has sustained actual damages by reason of the deprivation of his constitutional rights, and of mental pain, anguish, and suffering, and damage to his reputation, in the sum of $50,000."

33. Said complaint sought a judgment declaring said Exclusion Order and said Stay Order to be void and unconstitutional

and a Temporary Restraining Order and Permanent Injunction restraining their enforcement, "directly or indirectly by any means, method or device whatsoever from executing or causing to be executed or compelling plaintiff to execute said orders."

34. The plaintiff in said action sought judgment for actual damages in the sum of $50,000 and exemplary damages in the sum of $5,000.

35. That the defendant was never generally advised by the United States Department of Justice or the Attorney General that the procedure used by him prior to issuing individual exclusion orders violated the constitutional rights of a subject, but was informed by the War Department in April, 1943, that in connection with the request for the prosecution of said individual excludees of the Eastern and Western Defense Commands under Public Law 503 for violation of Exclusion Orders, the Attorney General had expressed an opinion that the Exclusion Orders would not be sustained by the Federal Courts in a criminal proceeding under Public Law 503, because the procedure would not permit a full disclosure of all adverse information or permit the subjects to be confronted by the witnesses against them. The Judge Advocate General of the Army and the staff Judge Advocate of the defendant Commanding General had advised at the time of the adoption of the individual exclusion procedure that it was constitutional because it accorded to a subject procedural due process of law to the greatest extent commensurate with the accomplishment of the duties delegated to defendant under Executive Order 9066.

36. With respect to the authority of the Army to enforce its exclusion orders, the Attorney General advised as did the Judge Advocate General, that if the Military Authorities believed recalcitrant excludees to be sufficiently dangerous to the military security of military areas they had the express power to exclude them by force under Executive Order 9066.

37. On May 6, 1943, plaintiff and 15 others were convicted of conspiracy to commit sedition in the criminal proceeding bearing number 15759, entitled United States v. Bell et al., D.C.S.D.Cal., 48 F. Supp. 986. Plaintiff was sentenced by the Court to five years in a Federal Penitentiary to be selected by the Attorney General. Plaintiff was one of the four persons convicted who were sentenced for a period of five years. On May 10, 1943, plaintiff (defendant therein) filed a written notice of appeal to the Ninth Circuit Court of Appeals, and upon application to the District Court was released on bail pending said appeal, as were the other appealing defendants.

38. Said appeal is now pending and plaintiff is at liberty on bail. All of the cases of those who had been indicted had been considered by the Counter-Intelligence Branch of the Western-Defense Command, but none of the convicted defendants were excluded from the military areas except plaintiff.

39. That of the four persons so convicted and receiving a sentence of five years, three of them including the affiant were released on bail in the sum of $5,000, and one in the sum of $15,000. None of the said persons except the plaintiff herein and no other associate of Mankind United except the plaintiff herein, was ordered excluded from California or the Pacific Coast, under individual military exclusion orders, or at all.

40. Plaintiff did not leave Military Area Nos. 1 and 2 upon the conclusion of the sedition trial which was contrary to the directions to him contained in the terms of said stay order and said Exclusion Order V-7. The plaintiff's suit for injunction filed March 25, 1943, was still pending and no Judgment was entered therein until November 15, 1948.

41. On May 12, 1943, the defendant Lt. Gen. John L. De Witt asked the War Department to request the United States Department of Justice to prosecute plaintiff under Public Law 503 for refusing to comply with Individual Exclusion Order V-7 and the "stay order," which request was conveyed to the Attorney General of the United States by letter dated May 18, 1943.

42. On May 20, 1943, the Hon. Harry A. Hollzer, Judge of the United States

District Court in said case of Wilcox v. DeWitt et al., 283, before whom the matter had been assigned for hearing, and after hearing on April 26, 1943, plaintiff's application for injunction pendente lite and defendant's motion to dismiss and to strike and for other relief, filed a memo of conclusion as follows:

"Memorandum of Conclusion
"Judge Hollzer, May 20, 1943

"It appearing that the complaint originally filed herein consisted of two counts, that under the first count plaintiff has sought equitable relief, more particularly an injunction decreeing that certain military exclusion orders are void and also an adjudication enjoining the defendants from executing said orders or causing the same to be executed, and that in said first count plaintiff has alleged, among other matters, that the execution of said orders has damaged him financially and that the threatened execution of the same will damage him further financially; and

"It further appearing that under the second count of said complaint plaintiff has sought to recover damages in the sum of $50,000.00 against the defendants by reason of the issuance and enforcement and threatened enforcement of said orders; and

"It further appearing that plaintiff has applied for an injunction pendente lite herein; and

"It further appearing that the only defendants who have been served herein are Lt. Gen. John L. DeWitt, also Messrs. H. Nathan and F. C. Dorward, the latter being agents of the Federal Bureau of Investigation, and that motions have been submitted on behalf of said defendants for an order dismissing the within entitled action, also for an order striking the second count from said complaint, and also for an order striking various portions of the first count; and

"It further appearing that shortly after the conclusion of the oral argument upon said application for an injunction pendente lite and upon said motions counsel for the respective parties joined in a request to the effect that the court defer decision upon said matters until after the conclusion

of the trial of that certain criminal cause wherein this plaintiff is one of the defendants, said cause being entitled United States v. Bell et al., D.C., 48 F.Supp. 986, and being designated as number 15759 upon the records of this court, and that thereafter and subsequent to the conclusion of the trial of said criminal cause counsel again requested that a decision upon said matters be deferred until after May 15, 1943, and

"It further appearing that thereafter and by leave of court plaintiff has filed herein a supplemental complaint setting forth, among other matters, that a verdict was returned in said criminal cause on May 6, 1943, finding plaintiff herein guilty of a violation of Section 34, Title 50, United States Code Annotated, also alleging that on May 10, 1943, judgment and sentence were pronounced against said plaintiff in said criminal cause to the effect that he be committed for imprisonment for a period of five years in an institution of the penitentiary type and further alleging that on the same day said plaintiff filed written notice of appeal from said judgment and sentence, and also obtained his release upon bail pending said appeal; and

"It further appearing that thereafter and upon application of said plaintiff an order was made herein dismissing the second count of said complaint; and

"It further appearing that the acts complained of herein, and which plaintiff alleges damaged him financially were performed by the defendants in the course of official duty as officers of the United States, pursuant to military orders issued by virtue of authority granted by the President of the United States to the officer issuing such orders, and under an executive order promulgated by the President in conformity with certain legislation enacted by the Congress of the United States; and

"It further appearing that the acts complained of against the defendants Nathan and Dorward were performed by them in relation to matters committed by law to their supervision and within their jurisdiction and were done in the discharge of official duty; and

"It further appearing that the acts complained of against the defendant General De Witt were performed by him in relation to matters committed by law to his supervision and discretion and within his jurisdiction and were done in the discharge of official duty.

"The Court Concludes that the defendants are not nor is any of them liable in damages to plaintiff for the acts complained of herein.

"The Court Further Concludes that the following portions of the first count should be stricken therefrom, to-wit, beginning with the words, "The execution of said order" on page 10, line 31, down to and including the end of Paragraph XIV of said first count.

"The Court Further Concludes that this cause should be set for an early trial on the merits, to-wit on June 15, 1943 also that plaintiff's application for Injunction pendente lite should be denied, without prejudice to plaintiff applying for injunctive relief at the trial, and that defendant's remaining motions should be denied, without prejudice to renewing the same at the trial.

"Copies to counsel.
"[Endorsed] Filed May 20, 1943"

43. On the same day, to wit, May 20, 1943, and prior to filing said memorandum of conclusions, the plaintiff dismissed the second cause of action for damages without prejudice with the approval of the Court as follows:

"Dismissal Without Prejudice and Order

"Comes now the plaintiff and dismisses, without prejudice his Second Cause of Action, denominated in his complaint as, "A separate and further cause of action."

"Lorrin Andrews,
"Attorney for Plaintiff.
"Order

"Good cause appearing therefor, It is Hereby Ordered that the Plaintiff's Second Cause of Action be, and hereby is, dismissed without prejudice.

"Dated at San Diego, this 20th day of May 1943.

"H. A. Hollzer,
"United States District Judge"

44. Thereafter, in May, 1943, defendant Lt. Gen. John L. De Witt requested the War Department for authority to physically remove plaintiff by use of military personnel, and pursuant to this request, the War Department authorized Lt. Gen. John L. De Witt to exclude plaintiff from California by force. The Judge Advocate General of the Army advised the War Department that military commanders, designated under Executive Order 9066, had the constitutional authority and power to execute by military force, if necessary, orders which they had issued pursuant to said Executive Order, and that this opinion had been confirmed by recent decisions of the United States Supreme Court.

45. On May 21, 1943, the Assistant Secretary of War, John J. McCloy, by radio, authorized defendant to remove plaintiff from the prohibited areas by means of United States armed guard, if necessary, and to advise the United States District Judge of the plan and purpose thereof, but that if the Judge did not concur, to advise Mr. McCloy pending additional instruction.

46. There is no evidence that the defendant, in compliance therewith or at all did "advise the United States District Judge of the plan and purpose" to remove plaintiff by armed guard or force. And the presumption being that the only evidence before the Judge was record evidence, it must be concluded as an undisputed fact that said plan and purpose to remove plaintiff by force was never communicated to the Judge who has since deceased.

47. On May 31, 1943, the defendant addressed a communication dated May 29, 1943, to the plaintiff further staying the said Exclusion Order V-7 on conditions which were substantially the same as those contained in the Stay Order of January 22, 1943, until the conclusion of the trial of said injunction suit.

48. On June 7, 1943, an answer was filed by defendant in Wilcox v. DeWitt, No. 283, in which by paragraph XI thereof in response to the allegations of paragraph XIV of the complaint in case 283,

(Par. 31 hereof) defendant admitted and denied as follows:

"The defendants admit each and every averment of paragraph XIV of the Complaint as modified by order of this Court striking out certain averments, except defendants deny the averment that execution of said orders up to the present time have damaged the plaintiff in excess of the sum of $3,000,000 exclusive of interests and costs."

49. The allegations of the complaint which were stricken as referred to in said paragraph XI of said answer asserted damages to the plaintiff because of the making of the "Letter-Order" or "Stay Order" (paragraph 29 hereof) as distinguished from the Exclusion Order V–7 (paragraph 27 hereof).

50. Pursuant to the request of the War Department to the Department of Justice to prosecute plaintiff under Public Law 503 (conveyed by letter dated May 19, 1943) to the Attorney General, the United States Department of Justice advised the War Department that it did not intend to institute criminal proceedings against plaintiff for violation of Public Law 503, for the reason that such violation was only a misdemeanor carrying a maximum sentence of one year, and plaintiff had already been convicted of a felony, conspiracy to commit sedition, and had received a prison sentence of five years upon facts which, in the Department's opinion, were essentially the same as those upon which the Exclusion Order was based.

51. On June 29, 1943, the case of Homer Glen Wilcox v. Lt. Gen. John L. DeWitt et al., No. 283, was tried before the Honorable Harry A. Hollzer, Judge of the United States District Court for the Southern District of California. At the trial the only evidence on the "use of troops" in the exclusion procedure was given by Colonel Karl Bendetsen, Assistant Chief of Staff, who testified as follows:

"Q. A. comprehensive system, that is, of enforcement, includes where necessary the use of troops in accordance with the provisions thereof in the President's Executive Order. A. Yes, sir.

"Q. Or such other acts as the military in its discretion may determine to take to enforce the order?"

52. The contents of the Administrative File regarding plaintiff's activities were not contradicted at the trial of case 283. The hearing was concluded on June 30, 1943. Thereafter briefs were filed with the Court which discussed among other things the question of defendant's right to execute the exclusion order against plaintiff through the use of military force. Plaintiff contended in his brief that the injunction action was one against "Admitted threatened military action, expressly in isolation from enforcement under Public Law 503," and that said law was the exclusive means of enforcing orders issued under Executive Order 9066. Defendant, in reply, contended that the exclusion order could be enforced and executed by the use of Federal troops and that Public Law 503 was not intended to be an exclusive means of enforcement.

53. The individual exclusion program as set up and enforced by the defendant provided no opportunity for review by any civilian agency or authority.

54. On July 30, 1943, defendant Lt. Gen. John De Witt was again advised by the United States Department of Justice that the latter would not prosecute plaintiff under Public Law 503 even though plaintiff should continue to violate the exclusion order after a ruling by the Court that the order was valid.

55. On July 30, 1943, the War Department authorized Lt. Gen. John L. De Witt to remove the plaintiff by use of military personnel from the State of California, by force, if necessary, without making any further request to him that he leave the prohibited areas, provided the Court's decision in the case of Homer Glen Wilcox v. Lt. Gen. John L. De Witt et al., No. 283, was favorable to the defendants.

56. On August 1, 1943, defendant Lt. Gen. John L. De Witt sent instructions to the Commanding General, Southern California Sector, Western Defense Command and Fourth Army as follows:

"Headquarters Western Defense Command and Fourth Army

"Office of the Commanding General

"Presidio of San Francisco, California

"August, 1943

"201—Wilcox, Homer (Civ) CAD No. V–7

"Subject: Escorting Homer Wilcox, Excludee, from Certain Prescribed Military Areas.

"To: Commanding General, Southern California Sector, WDC & 4th Army.

"1. An Individual Exclusion Order was issued by the Commanding General, Western Defense Command and Fourth Army, to Homer Wilcox (hereinafter referred to as Excludee), prohibiting him from being in, remaining in or entering into certain military areas designated in the inclosed copy of such individual Exclusion Order (Attachment I). This Order was served upon Excludee on 22 January, 1943. The time Excludee was served with the Individual Exclusion Order, he was under indictment by the United States of America on charges of sedition. Permission was granted by the Commanding General. Western Defense Command and Fourth Army, for Excludee to remain within the areas of the Western Defense Command from which he had been excluded until the conclusion of the trial of the sedition charges referred to. Thereafter, Excludee was convicted of sedition; he failed to depart from the military areas from which he had been excluded, and commenced a civil action against the Commanding General in the United States District Court for the Southern District of California, seeking to enjoin the Commanding General from enforcing the Individual Exclusion Order. The Commanding General thereupon on 29 May 1943 granted permission to Excludee to remain within the areas from which he had been excluded until the termination of the civil suit referred to. This permission was transmitted to Excludee in the form of a letter 'stay order,' dated May 29 1943, a copy of which is inclosed (Attachment 11).

"2. By the terms of the 'stay order' referred to. Excludee is required to depart from the Western Defense Command military areas from which he has been excluded upon conclusion of the trial. If at the conclusion of the trial the injunction sought against the Commanding General is denied, it is anticipated that Excludee may remain within the areas prohibited to him by the terms of the Individual Exclusion Order and letter 'stay order' in violation thereof. This headquarters will keep you advised in this regard, and direct communication between you and the Assistant Chief of Staff, Civil Affairs Division, this headquarters is authorized in the premises.

"3. Should Excludee violate the Individual Exclusion Order and letter 'stay order' by so remaining within the areas prohibited to him, upon notification to you from this headquarters, it is desired that you enforce the terms of the Individual Exclusion Order by escorting Excludee under military guard out of the prohibited areas specified in said Individual Exclusion Order.

"4. In the carrying out of this directive, you will be governed by the following:

"a. Major Victor I. Coppard, G–2 Section, WDC & 4th Army, Room 935, Bank of America Building, 625 Broadway, San Diego, California (Telephone Number Franklin 7411), will be prepared to assist in identification and location of Excludee at the time he is taken into custody.

"b. In connection with the apprehension, you are authorized to use only such force as may be reasonably necessary in entering premises where Excludee is located, or in which you have reasonable grounds to believe he is located. The exercise of particular care is enjoined upon those effecting the exclusion of individuals to assure that only the minimum show of force necessary be made in carrying out this mission. Selection of a proper time and place will go far toward obviating any necessity for drastic or offensive action.

"c. Care will be exercised in the selection of military personnel to effect this individual's exclusion. Experienced officers of mature judgment will be designated to command details assigned to this mission. The number of personnel re-

quired for such detail will be determined by you, with a view to avoiding any unnecessary public display. The detail should include a medical officer to forestall any feigned illness on the part of Excludee and to render assistance in the event that Excludee should actually become ill during confinement or en route.

"d. Prior to the apprehension of Excludee, you will contact Mr. L. F. Sloan, Evacuee Property Supervisor, War Relocation Authority, Room 955, 1031 South Broadway, Los Angeles, California (Telephone Numbers Prospect 4711 and Richmond 0311), who will be prepared to furnish a representative of War Relocation Authority to accompany your military guard when apprehending Excludee. The War Relocation Authority representative so accompanying your military guard will make whatever arrangements he deems advisable with Excludee direct at the time of such apprehension, to provide necessary funds to Excludee or to take care of any property or other affairs of Excludee.

"e. Upon apprehending Excludee, you will conduct him outside the area from which he has been excluded under the terms of the Individual Exclusion Order, and in so doing you are authorized to use common carrier or Army motor vehicles as you may determine most expedient in carrying out this directive. The point to which Excludee is escorted should be some central point from which Excludee can continue his journey to whatever point of destination he may select. It is the desire of this headquarters to render all reasonable assistance to Excludee in reaching his ultimate point of destination, and the route selected for travel and point of destination to which Excludee is escorted should be determined with a view of rendering all reasonable assistance to Excludee to reach the point of destination selected by him.

"f. Upon apprehension and if Excludee requests it, he will be afforded an opportunity to communicate with friends or counsel by telephone.

"g. If it becomes necessary to detain Excludee between the time of apprehension and the time of departure from the areas which he has been excluded, due to mak-

ing necessary traveling arrangements or for any unforeseen reason, you are authorized to obtain such hotel accommodations as you may deem necessary for such temporary detention. In obtaining any necessary hotel accommodations, in order to provide for the subsistence of Excludee, you are authorized to procure such hotel space on the American plan. Jails or guard houses will not be used for such detention. Procurement authority for procuring hotel space (on the American plan or otherwise is:

91—13 P 430—99 A 212/40905.

"h. If transportation by common carrier is selected by you as the most suitable means of carrying out this directive, you are authorized to issue necessary travel orders for the military personnel and for the Excludee, including necessary Pullman reservation and necessary subsistence while in detention or custody and while en route. Charge travel and subsistence of military and civilian personnel to:

1—5105 P 432—99 A 212/40425.

"5. A telegraphic report will be made by you to this headquarters immediately upon the apprehension of Excludee, and further telegraphic report will be made when your military escort has reached the point selected by you to which Excludee is to be escorted. Upon completion of this mission, a full written report is to be rendered to this headquarters.

"By command of Lieutenant General DeWitt:

"2 enclosures:

"Attachment 1—copy Ind. Excl. Order

"Attachment II—Copy ltr 'stay order' "

57. Said instructions of August 1, 1943, were not in evidence in said Case No. 283.

58. On September 4, 1943, a memorandum of conclusions was filed by the Honorable Harry A. Hollzer in the case of Homer Glen Wilcox v. John L. DeWitt, No. 283, which stated in the material parts as follows:

"Applying the foregoing views to the record before us the conclusion is inescapable that here the conditions confronting the Commanding General of the Western De-

fense Command and Fourth Army called for the exercise of judgment and discretion, and for the choice of means necessary for the protection of war materials and the members of the armed forces from injury and from the danger which attend the rise, prosecution and progress of war, and likewise gave to such commander wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Here, too, we must keep in mind, as pointed out by the Supreme Court in the Hirabayashi case [Kiyoshi Hirabayashi v. U. S., 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774], that the basic facts determined by General DeWitt in the light of the knowledge available adequately supported his findings as set forth in his Public Proclamations Nos. 1 and 2 to the effect that danger existed from espionage and sabotage, not only on the part of enemy aliens but also on the part of some American citizens.

"Likewise in the present suit we are not required to define the ultimate boundaries of the war power. We need to decide only whether the particular exclusion order under attack was and is within the boundaries of the war power. Again we need to determine only whether the circumstances within the knowledge of the Military Commander, charged with the responsibility for maintaining the National Defense with respect to the area comprising the Western Defense Command, afforded a rational basis for the decision he made in issuing said exclusion order. Whether this Court would have made it is irrelevant.

"Taking into consideration the record in its entirety we cannot say that the Commanding General did not have ground for believing that plaintiff had committed acts of disloyalty, that he had engaged in a kind of leadership which might instigate others to carry on activities which would facilitate the carrying on of espionage and sabotage, and that his continued presence in the area from which he had been ordered excluded constituted a danger to the military security thereof.

"As pointed out by Mr. Justice Douglas in the Hirabayashi case, when national survival is at stake we are not warranted in insisting on testing by the substantial evidence rule the decision of the Military Commander in issuing the Exclusion Order complained of herein. Again, as the justice there affirmed, peacetime procedures do not necessarily fit wartime needs; nor should the military in the present instance be required to wait until espionage or sabotage becomes effective before it moves. On the contrary, speed and dispatch may be of the essence. * * *

"Accordingly we conclude that plaintiff's application for an injunction must be denied, and that this suit must be dismissed. Likewise we are convinced that plaintiff without further delay should obey the Exclusion Order directed against him, as this Court will do nothing which might seem to interfere with the enforcement of such Order."

59. On the same day the following minute order was entered in said Case No. 283, viz.,

"Order Denying Injunction

"For the reasons set forth in the memorandum of conclusions this day filed, it is ordered that plaintiff's application for an injunction be denied, and that this cause be dismissed."

60. On September 4, 1943, immediately after receiving notification that Judge Harry A. Hollzer had denied the Injunction in the case of Homer Glen Wilcox v. John L. DeWitt, No. 283, defendant Lt. Gen. John L. De Witt notified the Office of the Assistant Secretary of War by telephone of the Court's decision, and that he was ready to proceed with the physical removal of the plaintiff by use of military personnel; that thereupon defendant Lt. Gen. John L. De Witt was advised by the Assistant Secretary of War to proceed to remove plaintiff by use of military personnel and to use all reasonable force to remove plaintiff from the prohibited area. Such authorization was given with the approval of the Secretary of War, Mr. Henry L. Stimson, and the Chief of Staff, General George C. Marshall, and the decision to grant the authorization was made in the light of the then existing military situation which was that the campaign in the Western Pacific had not been

360

won, the Japanese homeland had not been brought under American heavy bombing attacks and Germany controlled almost all of Europe. The facts in the Intelligence File and the fact that he had failed to obey the order of exclusion were likewise considered in the making of the decision to remove plaintiff by physical force.

61. That plaintiff did not at any time leave the area from which he had been ordered excluded, in accordance with the terms of said letter "Stay Order" of May 24, 1943, or said Individual Exclusion Order V–7 at the conclusion of said trial of said civil action entitled "Homer Glen Wilcox v. John L. De Witt et al.," No. 283, on June 30, 1943.

62. That on September 6, 1943, plaintiff was still residing within the Military Areas Nos. 1 and 2, from which he had been ordered excluded under Individual Exclusion Order V–7, and contrary to the terms thereof, and had at no time removed himself in accordance therewith. That prior to his forcible removal on September 6, 1943, as hereinafter set forth, the plaintiff had received no notice or information from any source that Judge Hollzer had made any ruling in such injunction suit, nor did plaintiff receive any notice after the decision of Judge Hollzer and prior to such removal by force from the defendant to voluntarily depart from California.

63. That on September 6, 1943, defendant Lt. Gen. John L. DeWitt, acting pursuant to said authority from the War Department upon his request therefor to employ the use of military personnel to remove plaintiff, and acting pursuant to information from the United States Department of Justice that plaintiff would not be prosecuted under Public Law 503, and relying upon the rulings made in Wilcox v. DeWitt, No. 283, on September 4, 1943, ordered plaintiff to be escorted from the prohibited area of the Western Defense Command by military guard.

64. September 4, 1943, was a Saturday, September 5, 1943, was a Sunday, and September 6 was Labor Day and the Courts of the United States were not open for business. Plaintiff between the time of the entry of the minute order denying his application for an injunction by Judge Hollzer on September 4 and September 6 was not given any notice by defendant that he would be removed by armed guard. The plaintiff had not been given any notice of a threatened or prospective removal by armed guard at any time prior to his removal by said armed guard on September 6. The plaintiff had no notice and no information pertaining to Judge Hollzer's ruling until so advised by an officer in said armed guard on September 6, 1943.

65. On September 6, 1943, at approximately 4:00 P.M. certain military personnel consisting of more than 6 soldiers of the Southern California Sector of the Western Defense Command, under the immediate command of Captain Herman Dotson, CMP, acting pursuant to orders of Lt. Gen. John L. De Witt, proceeded to the residence of plaintiff at 1716 Union Street, San Diego, California.

66. They rang the doorbell at the front door at least a half dozen times and pounded on the front door in an effort to attract attention of the occupant and gain entrance to the house. No one appeared at the door, and they subsequently rang the doorbell in the rear of the house and pounded on the door without response. They then forced the screen door at the back entrance and pounded on the second door on the back porch without response. There was no response to these knocks. An effort was made to open the lock of the rear second door by obtaining the key, but without success, and then the bolts of the door were withdrawn to take it from its hinges, without success. Finally, they broke the glass partition of the rear door at the back entrance, enabling one of the party to turn the key of the lock from the inside. Upon entering the house they found therein plaintiff, two men and a woman. The escorting party then informed plaintiff that he was being apprehended under Exclusion Order V–7 and excluded from the prohibited area, and told him to pack his bag. Plaintiff was advised by the Captain that if he did not comply with the demand that plenty heavily armed men were present to see that he did. Plaintiff did so and was escorted by said soldiers to the

Officers' Quarters at the Tioga Hotel in San Diego where he was attended by an armed guard and examined by a medical officer to determine his fitness for the trip, and was asked to designate a destination. He selected Las Vegas, Nevada, as his destination, and stated he was without funds. A representative of the War Relocation Authority tendered him $50 in cash, which he accepted. He was served supper and given an opportunity to use the telephone and made one telephone call. Plaintiff departed by government vehicle, in the company of the escorting party at 6:50 P.M., and arrived in Las Vegas, Nevada, at 4:15 A.M. on September 7, 1943. The military personnel assisted plaintiff in obtaining a room at the Apache Hotel at Las Vegas. Before his departure, he shook hands with all members of the escorting party. It was not necessary to use physical force and none of any kind was used on the person of plaintiff during the entire mission of apprehending and escorting plaintiff from the prohibited areas, other than as above set forth.

67. Wilcox returned the $50 on September 10, 1943, and at the same time wrote to the War Relocation Authority that his being taken across the state line in Nevada was against his will and under compulsion.

68. On September 8, 1943, the defendant issued an order to the Commanding General of the Southern California sector, Western Defense Command, that the plaintiff be again escorted under military guard out of the prohibited areas specified in the individual exclusion order, if the plaintiff returned into said areas, upon notification from the headquarters of the Western Defense Command so to proceed.

69. On September 17, 1943, Lt. Gen. Delos C. Emmons was designated Commander of the Western Defense Command, replacing Lt. Gen. John L. De Witt, and was authorized by the Secretary of War to carry out the duties and responsibilities imposed by the Executive Order for that Command.

70. On November 15, 1943, Findings of Fact, Conclusions of Law were signed by Judge Harry A. Hollzer, and Judgment entered in Civil Action No. 283, entitled "Homer Glen Wilcox v. John L. DeWitt et al.," as follows:

"Findings of Fact

"I. That the only defendants herein served are Lt. Gen. John L. DeWitt, Military Commander of the Western Defense Command and Fourth Army, N. Nathan and F. C. Dorwart, Agents of the Federal Bureau of Investigation of the Department of Justice.

"II. That the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000.

"III. That Lt. Gen. John L. DeWitt, one of the defendants herein and at the times herein mentioned, was the Commanding General of the Western Defense Command and Fourth Army. The mission of the Commanding General, Western Defense Command, is the protection of the eight western states and Alaska from external hostile attack and any internal attack.

"IV. That the Western Defense Command has been designated by the military authorities as a theatre of military operations. Such a theatre is defined as an area necessary for military operation and the administration and the supply incident to military operation. The zone closest to the enemy which is required for the actual operation of the combatant forces is designated as a combat zone. The rear area of a theatre of opertions is known as a zone of communication, in which supply and administrative troops function to provide necessary services for the combat forces. The coastal area of the Pacific Coast States of Washington, Oregon, and California is a combat zone, and the remaining area of the Western Defense Command is a zone of Communication.

"V. That pursuant to Presidential Executive Order No. 9066, issued February 19, 1942, Lt. Gen. John L. DeWitt, as Commanding General, Western Defense Command and Fourth Army, was designated as the military commander to carry out the duties and responsibilities imposed by said Executive Order for the Western Defense Command (Defendant's Exhibit A). Under the said Executive Order, Lt. Gen. DeWitt, in order to provide protection against espionage and sabotage, was authorized to prescribe military areas within the Western

Defense Command from which any and all persons could be excluded and with respect to which the right of any person to enter, remain in or leave, would be subject to whatever restrictions he might impose in his discretion.

"VI. That by Proclamation No. 1, dated March 2, 1942, Lt. Gen. John L. DeWitt created Military Areas Nos. 1 and 2, upon the finding that the Pacific Coast was particularly subject to attack, attempted invasion by the armed forces with which the United States is at war, and in connection therewith was subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations. Military Areas Nos. 1 and 2 as then defined included the States of Washington, Oregon, California and Arizona. Area No. 1 includes approximately the same area as the said combat zone.

"VII. That by letter dated July 15, 1942 (Defendant's Exhibit C) the Secretary of War, pursuant to said Presidential Executive Order No. 9066, authorized General DeWitt to prohibit any and all persons who might be excluded by him from Military Areas of the Western Defense Command, from also entering, being in or remaining in other Military Areas of the United States as prescribed pursuant to the said Executive Order, including the Eastern Military Area in the Eastern Defense Command and the Military Areas of the Southern Defense Command.

"VIII. That since the declaration of war and until the date of the hearing hereof, there was a continued threat of external enemy attack by sea and air on the Pacific Coast, which is particularly in danger of hit-and-run raids and enemy air raids conducted for the purpose of destroying and disrupting Pacific Coast war industries. Sabotage and espionage in connection with such attacks may be reasonably anticipated. The length of the coast line of Military Area No. 1 is a fact to be considered in estimating the possibility of such attacks being attempted and the precautions which must reasonably be taken to guard against them.

"IX. That within Military Areas Nos. 1 and 2, and during the period last above mentioned, there was a large concentration of national defense material, premises and utilities as defined by the Act of August 21, 1941, 55 Stat. 655 (U.S.C.A., Title 50, Sec. 104), consisting of strategic army and navy installations and establishments, aircraft factories with one-fourth of the aircraft contracts being performed in the country, shipyards constructing a large portion of the ships being built in the United States, and many other plants producing vital war materials, and vast timber resources which are of vital importance in the construction of war materials. Many thousands of troops were conducting maneuvers within Military Areas Nos. 1 and 2 and troops and supplies in large numbers and amounts were sailing from the ports of the Pacific Coast. The manufacture of military supplies, the movement of ships, men and materials from Pacific Coast ports to the Pacific battlefronts, and the use of California ports by naval vessels for repair and outfitting presented a likelihood of espionage and sabotage which for obvious reasons of military necessity made the prevention of sabotage and espionage within Military Areas Nos. 1 and 2 a matter of military concern.

"X. That in 1938 plaintiff became associated with the work of an organization known as "Mankind United" and in May, 1939, became Bureau Manager of the Beacon Bureau of this organization for San Diego, California, of which Bureau plaintiff is the sole owner. For approximately a year and a half plaintiff's activities therewith consisted of supervising the circulation of the organization's literature, summarizing its reports, and instructing individuals to qualify them to become leaders in the organization work so they, in turn, might instruct from 65 to 70 other persons to carry on the activities of "Mankind United."

"XI. That on December 17, 1942, plaintiff was indicted by the Federal Grand Jury under Section 34, United States Code Annotated, Title 50, and convicted of conspiracy to commit sedition on May 6, 1943, in criminal proceedings bearing No. 15759,

entitled United States v. Bell et al., D.C., S.D.Cal., 48 F.Supp. 986, and was sentenced by the Honorable Leon R. Yankwich to five years in the Federal penitentiary. Plaintiff, defendant therein, filed a written notice of appeal on May 10, 1943, and upon application was released on bail pending said appeal to the Ninth Circuit Court.

"XII. That on October 26, 1942, plaintiff was served with a summons (Plaintiff's Exhibit No. 1) informing him that a Board composed of officers of the United States Army would convene in San Diego, California, on November 3, 1942, to consider whether military necessity required plaintiff's exclusion from certain military areas, and further advising him that if he desired, he might appear at that time and place for the purpose of being informed of the general nature and scope of the inquiry and afforded an opportunity to present evidence in his own behalf and that he could be accompanied in his appearance before such Board by counsel, who would be allowed to act only as plaintiff's advisor; and that the inquiry was in no sense a criminal proceeding.

"XIII. That at the time said summons was served on plaintiff, a questionnaire (Plaintiff's Exhibit No. 2) was served on him, which advised him that the information requested therein would be helpful to the Board in determining whether he would be excluded, which completed questionnaire he filed with the Board at the time he appeared before it.

"XIV. That in accordance with the summons aforesaid, a Board of Officers convened at San Diego, California, on November 3, 1942, before whom plaintiff voluntarily appeared. At the outset of the hearing an officer who acted as President of the Board read to plaintiff a statement similar to the contents of the summons theretofore served upon him and advised him (Plaintiff's Exhibit No. 3-B) that the Board was concerned with and extended to him an opportunity to testify and to introduce any evidence he desired with respect to his background, associations, and activities, including the circumstances surrounding his membership in "Mankind United" and the nature of his duties and activities in connection with that organization.

"XV. That the summons and questionnaire served on plaintiff on October 28, 1942, the statement made by the President of the Board at the outset of the hearing referred to in Paragraph XIV above, and the questioning of the plaintiff during the hearing before such Board apprized him of the fact that his exclusion was being considered and tended to apprise him of the grounds upon which the necessity for his exclusion was based.

"XVI. That plaintiff was not permitted to have counsel participate in the actual hearing before the Board of Officers on November 3, 1942, but was allowed to and did have counsel remain with him and advise him throughout such hearing.

"XVII. That the general nature of the questions asked plaintiff at the hearing before the Board of Officers on November 3, 1942, tended to apprize him of the information upon which the exclusion hearing was based, and plaintiff at the said hearing was afforded an opportunity to testify fully and to offer the testimony of any other witnesses.

"XVIII. That, in addition to the opportunity to be heard with respect to the necessity for his exclusion accorded to the plaintiff by the Board of Officers on November 3, 1942, the plaintiff had further opportunity to be heard in such respect in this proceeding. The evidence adduced at this proceeding before this Honorable Court (particularly Defendant's Exhibit D), together with the testimony offered by the defendants, apprized the plaintiff of information (with the exception of data as to the identity of sources of such information) upon which the defendant, Lt. Gen. John L. DeWitt, had determined that the issuance of the order dated December 28, 1942, prohibiting the plaintiff's presence in specified areas of the United States was a military necessity.

"XIX. That the individual exclusion order was issued by Lt. Gen. John L. DeWitt after a study by him of the reports of intelligence agents of the United States Government, the information received from the questionnaire filed by plaintiff with the

Board, the testimony of the Board hearing on November 3, 1942, and the appraisals and recommendations made by the Board, by other staff officers, and by the United States District Attorney for the Southern District of California. The administrative file (Defendant's Exhibit D), the material contained in which was uncontradicted at the trial, shows that Wilcox at the time of the issuance of the order was the San Diego County Supervisor of "Mankind United", an organization which is opposed to the present war. The file shows that meetings held in various parts of Southern California within Military Area No. 1 and after the entrance of the United States into war; the plaintiff made speeches and urged action by his hearers, the extent and nature of which may be summarized as follows: The war is being fought for the 'war lords' who are prolonging it for their profit. War bonds should not be purchased as the war will thereby be prolonged. Defense workers who are building warplanes and war implements should realize that such equipment will be used against them. "Mankind United" will be able to stop the war by striking at the manufacture of war equipment and destroying munition dumps. People should not enlist in first aid courses. Dimout regulations, gasoline and rubber rationing were unnecessary and were merely an effort on the part of the Government to curtail the liberties of the people.

"XX. That on December 28, 1942, defendant, Lt. Gen. John L. DeWitt issued Individual Exclusion Order No. V-7, excluding plaintiff from certain areas of the Pacific and Atlantic Coasts ten days from the date of service thereof, which order was served on the plaintiff on January 22, 1943.

"XXI. That the disclosure of the data referred to in connection with Defendant's Exhibit D with respect to the identity of sources of information would tend to hinder the further investigative work of agencies of the United States Government. The non-disclosure of this data is justified by public policy.

"XXII. That the evidence concerning plaintiff's activities and associations provided a reasonable ground for the belief by defendant, Lt. Gen. John L. DeWitt, that plaintiff had committed acts of disloyalty and was engaged in a type of subversive activity and leadership which might instigate others to carry on activities which would facilitate the commission of espionage and sabotage and encourage them to oppose measures taken for the military security of Military Areas Nos. 1 and 2, and that plaintiff's presence in the said areas from which he had been excluded would increase the likelihood of espionage and sabotage and would constitute a danger to the military security of those areas. It was, therefore, a reasonable precaution, in the light of the said dangers, to exclude plaintiff from Military Areas Nos. 1 and 2.

"XXIII. That the exclusion procedure adopted by the defendant, Lt. Gen. John L. DeWitt, was designed to protect the vital war industries, lines of communication, military installations and resources located within Military Areas Nos. 1 and 2 of the Western Defense Command, and was appropriate for that purpose. Individual exclusions of those persons who are deemed to be potentially dangerous to the security of designated military areas is a recognized military procedure designed and appropriate for the purpose of safeguarding military areas against potential sabotage and espionage and other subversive activity.

"Conclusions of Law

"I. Presidential Executive Order No. 9066 authorized the Military Commanders designated by the Secretary of War to exclude from Military Areas established by them any or all persons for the purpose of providing protection against espionage and sabotage to national defense material, premises, and utilities, as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U.S.C.A., Title 50, Sec. 104).

"II. Lt. Gen. John L. DeWitt as Commanding General of the Western Defense Command was duly authorized by the Secretary of War to carry out the duties and responsibilities imposed by the said Executive Order.

"III. Military Areas Nos. 1 and 2 of the Western Defense Command were lawfully established by Proclamations Nos. 1 and 2 issued by Lt. Gen. John L. DeWitt.

"IV. The authority to establish the said Military Areas and to exclude therefrom any or all persons for the purpose of providing protection against espionage and sabotage, as granted by Presidential Executive Order No. 9066 and delegated thereunder to Lt. Gen. John L. DeWitt and as exercised by him through the issuance of Public Proclamation Nos. 1 and 2, was approved and ratified by the Congress of the United States by its enactment of Public Law No. 503, Act of March 21, 1942 (18 U.S.C.A., Sec. 97a). The said authorization and delegation and ratification are constitutional exercises of the war power by the President and the Congress.

"V. The individual exclusion of persons from designated Military Areas for the purpose of preventing espionage and sabotage was approved and ratified by the Congress of the United States through its enactment of said Public Law No. 503.

"VI. Lt. Gen. John L. DeWitt was lawfully authorized by the Secretary of War to exclude individuals from Military Areas of the Western Defense Command.

"VII. Individual Exclusion Order No. V-7 was made and issued by defendant, Lt. Gen. John L. Dewitt, under the authority of the said Executive Order No. 9066, lawful authorization of the Secretary of War, and the authority granted by Congress when it enacted Public Law No. 503.

"VIII. The procedure by which plaintiff was ordered excluded from Military Areas Nos. 1 and 2 was reasonably adapted to the carrying out of the duties and responsibilities of the defendant, Lt. Gen. John L. DeWitt, under the authority delegated to him as Commanding General of the Western Defense Command.

"IX. The Individual Exclusion Order No. V-7 directed to plaintiff was not issued arbitrarily, was made in good faith, was dictated by adequate reasons of military necessity, and was a reasonable and appropriate means to prevent espionage and sabotage and to preserve the military security of said Military Areas Nos. 1 and 2.

"X. The said Exclusion Order is legally and constitutionally valid both from the standpoint of substance and procedure.

"XI. The non-disclosure of data with respect to the identity of sources of information described in Finding XXI was proper, as disclosure would have been harmful to the interests of the United States.

"Dated: This 15 day of November, 1943.

"H. A. Hollzer
"United States District Judge"

Approved as to Form as Provided in Rule 8:

. . . . . . . . . . . . . . . . . . .
Attorney for Plaintiff.
. . . . . . . . . . . . . . . . . . .
Attorney, Amicus Curiae.

"Received copy of the within Findings of Fact & Conclusions of Law this 6 day of November, 1943 at 12:00 noon
"11:40 A M

"A. L. Wirin
"D. M.
"Attorney for
"Homer Glenn Wilcox
"Lorrin Andrews
"A. W."

[Endorsed]: "Filed Nov 5 1943."

"In the District Court of the United States in and for the Southern District of California, Southern Division

"No. 283—Civil

"Homer Glen Wilcox, Plaintiff, vs. Lt. Gen. John L. DeWitt, Lt. Col. Frank E. Meek, Lt. Col. Colbert C. McClain, Lt. Col Harry M. Deyo, H. Nathan, L. A. Ducommon, and F. C. Dorwart, defendants.

"Judgment

"The above entitled cause having duly come on for trial on the 29th day of June, 1943, before the Honorable Harry A Hollzer, one of the Judges of the above entitled Court, sitting without a jury, the jury having been waived by failure of the plaintiff to request; Lorrin Andrews and Russell E. Parsons having appeared as at-

torneys for the plaintiff and A. L. Wirin having appeared as Amicus Curiae on behalf of the American Civil Liberties Union, and Charles H. Carr, United States Attorney for the Southern District of California, Mildred L. Kluckhohn, Assistant United States Attorney for said District, and Edward J. Ennis, Director Alien Enemy Control Unit, Department of Justice, having appeared as attorneys for the defendants, Lt. Gen. John L. DeWitt, H. Nathan and F. O. Dorwart; and evidence both oral and written having been adduced at time ·of trial, and argument of counsel heard; said cause having been duly considered by the Court on the pleadings on file, evidence, and arguments of counsel, and upon such consideration the Court has ordered Judgment herein in favor of the defendants, Lt. Gen. John L. DeWitt, H. Nathan and F. C. Dorwart, as against plaintiff, Homer G. Wilcox;

"Now, Therefore, It Is Ordered, Adjudged and Decreed, that the plaintiff's application for an injunction be denied and that the within action be and the same is hereby dismissed as to the said defendants, Lt. Gen. John L. DeWitt, H. Nathan, and F. C. Dorwart.

"Dated this 15 day of November, 1943.
"H. A. Hollzer,
"United States District Judge."
"Approved as to Form as Provided in ·Rule 8.

. . . . . . . . . . . . . . . . . . . .
Attorney for Plaintiff.
. . . . . . . . . . . . . . . . . . . .
Attorney, Amicus Curiae.

"Received Copy of the within Judgment this 6 day of Nov. 1943, 11:40 A. M.
"Lorrin Andrews,
"Attorney for Plaintiff.
"A. L. Wirin,
"DM 12:00 noon
"Plaintiff."

"Judgment entered Nov. 15, 1943. Docketed Nov. 15, 1943. Co Book 7, Page 487. Edmund L. Smith, Clerk, By L. Wayne Thomas, Deputy."

[Endorsed]: "Filed Nov. 15, 1943."

71. On November 22, 1943, notice of appeal was filed and served in civil case en-titled "Homer Glen Wilcox vs. John L. DeWitt, et al., No. 283."

72. That pursuant to the policy of the Commanding General to review exclusion cases periodically, a Board of Review reviewed the case of plaintiff and in November 1943, made the following findings and recommendations to the Commanding General through the Director of the Civil Affairs Division.

"Facts and circumstances developed at the time of Wilcox's hearing, * * * and from files of investigative agencies available to this Board, indicate beyond a question that because of his affiliation with the known pacifist organization and from the militant support that he gave this organization, that there was a possibility of Wilcox acting in a manner detrimental to the war effort. It is therefore believed that his exclusion from the area of the Western Defense Command at the time was prudent. This Board takes cognizance of the fact that Wilcox is under conviction by Federal Court as a seditionist, and that subsequent to his conviction, he has been forcibly ejected from the area of the Western Defense Command for failure to obey the Exclusion Order issued against him.

"Although taking cognizance of the facts and circumstances outlined above, it is the opinion of this Board that because of lack of anything to indicate a connection between Wilcox and agents of foreign governments, there is no more likelihood of his engaging in acts hostile to the war effort on the West Coast than in any other part of the country. This, in connection with the fact that the military situation confronting the United Nations has definitely improved, as evidenced on the West Coast by the separation of the Alaska Defense Command from the Western Defense Command and the relaxation of various defense measures, indicates that the facts and circumstances in this case may be reappraised.

"Conclusion:

"It is the conclusion of this Board that, although still probably pacifistic in his sentiment, there is little likelihood that Wilcox would constitute a threat to the security of the Western Defense Command were he permitted to return to the area thereof. ·

"Recommendation:

"It is recommended that the Exclusion Order now in effect in this case be suspended."

73. The Civilian Affairs Division concurred in the Board's recommendation but the Counter-Intelligence Branch recommended continued exclusion. On November 27, 1943, Lt. Gen. Delos C. Emmons ordered that the Exclusion Order be continued in effect.

74. On January 15, 1944, Lt. Gen. Delos C. Emmons, after further consideration of the Individual Exclusion case of Homer Glen Wilcox suspended Exclusion Order V-7, and on January 18, 1944, plaintiff was advised by Lt. Gen. Delos C. Emmons that he might return to the State of California.

75. Plaintiff remained in the State of Nevada from September 6, 1943, to January 20, 1944, which is in Military Area No. 5, and during said time plaintiff did not return to the State of California or to any other portion of Military Areas No. 1 and 2.

76. On January 20, 1944, plaintiff returned to the State of California, where he has since been residing in the City of San Diego.

77. On March 22, 1944, Exclusion Order V-7 was rescinded by Lt. Gen. Delos C. Emmons in the light of the then existing conditions.

78. Thereafter and on July 12, 1944, Clyde C. Downing, Assistant United States Attorney in charge of the appeal (subject to the direction of the Attorney General) in the case of Wilcox v. De Witt et al., 9 Cir., 144 F.2d 353, representing the defendants on appeal, filed a motion to dismiss the appeal on the ground that the case was moot since the individual exclusion order relating to plaintiff has been rescinded.

79. On June 1, 1944, a stipulation was filed in cause numbered 10650 in the U. S. Circuit Court of Appeals in words and figures as follows:

"In the United States Circuit Court of Appeals for the Ninth Circuit.

"Homer Glen Wilcox, Appellant, vs. Lt. Gen. John L. De Witt, H. Nathan and F. C. Dorwart, Appellees. No. 10650. Stipulation.

"It is hereby stipulated by Appellant and Appellees, through their counsel, that the appeal pending herein be dismissed upon the following terms and conditions, to-wit, without prejudice to any new or further proceedings arising out of appellant's expulsion from the State of California, as involved herein; and that said appellant will pay costs and to the Clerk of the court any fees that may be due to him.

"Dated: May 31, 1944.
      "CHARLES H. CARR
            "United States Attorney
      "RONALD WALKER AND
      "CLYDE C. DOWNING
            "Assistant U. S. Attorneys
            "Attorneys for Defendants,
      "By CLYDE C. DOWNING
      "LORRIN ANDREWS
            "Attorney for Appellant"

That prior to the execution of said stipulation said Clyde Downing told Lorrin Andrews the record Attorney of plaintiff in said appeal among other things "that he did not believe the dismissal would estop whatever action for damages" appellant might have as a result of his physical expulsion after the rendition of the judgment in the trial court.

80. On July 27, 1944, appellant, through his attorney filed an affidavit in opposition to said motion to dismiss on the ground that plaintiff herein had been physically expelled from the State of California subsequent to the decision of Judge Hollzer and filed a motion to remand the cause, with directions that the United States District Court grant leave to appellant to file a supplemental complaint in the case of Homer Glen Wilcox v. Lt. Gen. John L. De Witt et al., No. 283, for the purpose of filing a damage action based upon plaintiff's removal from Military Areas Nos. 1 and 2. Appellee's motion to dismiss and appellant's motion to remand came on for hearing before the Ninth Circuit Court of Appeals.

81. On July 31, 1944, the Ninth Circuit Court of Appeals entered the following Order (144 F.2d 353):

"Upon consideration of the stipulation of counsel for respective parties for dismissal of appeal herein, and good cause therefor

appearing, it is ordered that the appeal herein be, and hereby is dismissed, without prejudice to any new or further proceedings arising out of appellant's expulsion from the State of California as involved herein, that a decree of dismissal be filed and entered accordingly and the mandate of this court in this cause issue forthwith."

82. Said mandate was filed August 1, 1944.

83. Appellant and plaintiff herein did not subsequent to August 1, 1944, file a supplemental complaint in that action entitled "Homer Glen Wilcox v. John L. De Witt et al.," No. 283. The instant suit was as filed herein on September 5, 1944.

84. The extent of the military areas established by military commanders, pursuant to the authority granted to them under Executive Order 9066, was as follows:

a. Military areas 1, 2, 3, 4, 5, and 6, established by the Commanding General of the Western Defense Command, encompassed the State of Washington, Oregon, California, Arizona, Idaho, Montana, Nevada, and Utah. Individual excludees were excluded from Military Areas Nos. 1 and 2, which at the beginning of the exclusion program consisted of the State of Washington, Oregon, California and Arizona. (7 F. R. 2320, 2405).

b. The Eastern military areas established by the Commanding General of the Eastern Defense Command comprised the State of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia and Florida. (7 E. R. 3830) At the outset, individuals excluded by the Eastern Defense Command were excluded from the entire eastern military area. Later, as the military situation improved with respect to that area, individual excludees were excluded only from the coastal counties of the above named states.

c. Military Area No. 1 of Florida, Alabama, Mississippi, Louisiana, Texas and New Mexico, as established by the Commanding General of the Southern Defense Command, consisted of the counties of the above named states bordering upon the Gulf of Mexico and the United States Mexican border. (7 F. R. 6764)

d. Total Exclusion Area No. 3, established by the Commanding General, Western Defense Command, comprised an area in the vicinity of the town of Hanford, Grant County, Washington.

e. Military Area No. 1, established by the Commanding General, Southern Defense Command, in the state of Tennessee, comprised certain areas in Roane and Anderson counties, Tennessee. (8 F. R. 8924)

85. Plaintiff, Homer Glen Wilcox, and his attorney, A. L. Wirin, signed and filed on April 1, 1946, a statement to the Court that in the event the Court should award damages to plaintiff, they be in a sum not to exceed $100.

86. Without exception every Civilian Restrictive Order, every proclamation, every exclusion order, mass as well as individual, provides that violation thereof shall subject the violator to the penalties of Public Law 503, 77th Congress, approved March 21, 1942, entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones," although the dim-out and black-out orders also provided that a violator "is subject to immediate exclusion from the territory of the Western Defense Command"; none of the orders, exclusion or otherwise, gave any notice or indication that physical force would be used to execute the orders.

87. The United States District Court for the Southern District of California and the various State Courts in the State of California have at all times been open for criminal prosecutions for violation of federal and state laws, respectively, and with respect to all offenders.

88. During the last decade and since Pearl Harbor, there have been two prosecutions on the Pacific Coast for violation of Section 33. United States Code Annotated, Title 50, both in the United States District Court for the Southern District of California; a prosecution against Robert

Noble and Ellis O. Jones,[1] and the prosecution against the plaintiff and his associates. In both cases there were convictions.

89. Under Executive Order 9066, curfew was imposed upon a class of more than one hundred thousand persons, most of whom were citizens; that blackout and dim-out regulations applied to all persons; that flying regulations applied to all persons; that cameras, radios, and other personal property harmless in themselves were denied to the possession of a designated class of citizens exceeding a hundred thousand in number; and that as recently as January 25, 1945, Civilian Restrictive Order No. 33 was issued which applied to all persons and prohibits any person from transferring or delivering certain designated articles to any excludee, and as a matter of common knowledge these articles were surrendered to the various Sheriffs and Chiefs of Police.

90. In arriving at a decision as to whether to issue an individual exclusion order, the Commanding General may go outside of the information submitted to him in writing and contained in the record of an individual exclusion case, to various agencies for information; or to secure their views or recommendations; such agencies include the Chief of Staff of G-2, in charge of Intelligence, or other people of that kind and he may rely upon such information. In some instances, the Commanding General may make an individual investigation.

91. Normally, the subject of an individual military exclusion procedure does not know the source of information which the Commanding General relies upon in making the order.

92. The subject did not know the procedure or the steps in the procedure; and he had no way of finding it out, or any changes in procedure which were made from time to time; the instructions to the Hearing Board are not disclosed to the subject.

93. The regulations are not made available to the subject. The procedure followed is not published except to the personnel of the headquarters of the Western Defense Command; and there is no document that

is the counterpart of the Manual for Court-Martial.

94. Up to September, 1943, the only civilian who made recommendations was the United States Attorney; subsequent to September 1943, the United States Attorney no longer participated in the individual military exclusion procedure.

95. The procedure does not provide for a review or appeal to anyone other than the commanding general. There is no provision for an appeal, to, or review by, the Secretary of War or the President.

96. When changes are made in the procedure, they are not reflected by any written rule or regulation. The procedure is not published in the Federal Register or with the Congress.

97. Where subject is ordered excluded, he has no way of finding out what guide or standard the Commanding General employed in determining what is a potential security risk. That is a military decision.

98. The standard changes from day to day. The whole matter is relevant. A lot depends on enemy activity or anything else that happens.

99. There is no provision for the issuance of subpoenas; and the subject of an exclusion order had no right of subpoena witnesses.

100. There is no provision for judicial review in the procedure set up by the Commanding General.

101. Under court martial procedure a person subject to military law is, among other rights and privileges, accorded the following rights:

(1) Prior to trial an accused is provided with a statement of the charges against him in accordance with the Articles of War, and is provided an opportunity to interview the witnesses and examine the evidence to be presented against him. Depending upon the type of court martial which passes judgment and the type of sentence rendered, an accused in many instances is entitled to have his case reviewed by the Chief of Staff and, in some instances, by the President of the United States.

---

[1] No opinion for publication.

Military personnel charged with the commission of offenses under the Articles of War are tried by court martial in Combat Zones or theatres of operation when such trial within those Areas will not interfere with military operations. When it does, the trial will be held outside of those Areas.

(2) The accused has the right to have counsel appointed for him and, in addition, counsel of his own choosing who have the right to cross-examine the witnesses who appear against the accused at the court martial.

(3) At the trial all the evidence is considered by the Court in judging the guilt or innocence of the accused, and counsel for the accused have opportunity to cross-examine the witnesses presented against him.

(4) The judgments of court martial are reviewed by higher military authority who either approve, reduce or disapprove the judgment of conviction rendered by the court martial.

102. It is the usual practice (and the practice followed in the matter of the exclusion of Wilcox) for the names of all witnesses supplying information to the Western Defense Command pertaining to a subject of exclusion, whether the witnesses are paid informants or are just ordinary citizens, not to be communicated to the subject, whether or not the informant had requested that his name be kept confidential.

103. The disclosure of the entire individual military exclusion procedure by general publication would not have been objectionable from a standpoint of military security.

104. The individual exclusion procedure is new with this war.

105. In all of the acts and things done by or under the direction of the defendant, as aforesaid, he acted in good faith, and with honest belief that Executive Order No. 9066, and Law 503 authorized and empowered him to do or direct said acts and things: that his act of physical expulsion and exclusion of plaintiff as aforesaid, was previously authorized and subsequently ratified and approved by his immediate military superiors; and, that none of said acts and things so done or directed by the defendant were done with any personal malice or caprice, or with a personal desire on the part of said defendant to arbitrarily, or illegally, or tortiously, or recklessly, or oppressively affect or disregard the right of the plaintiff.

106. That the amount in controversy exceeds $3,000.00 exclusive of interest and costs.

107. That the amount of damages to the plaintiff in excess of $100 is not in controversy.

108. That the plaintiff suffered an actual cash loss of $100.

## Issues of Law

The questions of law arising on the motions for summary judgment may be summarily stated as follows:

1. Was the judgment in Case No. 283 a final judgment?

2. If so, to what extent is the plaintiff estopped, if at all, under the doctrine of res judicata by the judgment of the trial court in case No. 283?;

3. If the plaintiff is not completely estopped, then was the making of Exclusion Order No. V-7 (Par. No. 27, supra) within the lawful power of the defendant as Commanding General?; and, if the making of the Order was within such lawful power, was the procedure followed in making the order lawful?;

4. If so, did the defendant, as Commanding General, have the lawful power to expel and exclude the plaintiff from Military Areas Nos. 1 and 2 by physical and military force, in execution of said Exclusion Orders?;

5. If such lawful power did not exist, is the defendant liable in damages to the plaintiff for such expulsion and exclusion by physical and military force?;

6. If the defendant is liable in damages, then what is the measure thereof and the amount?

Upon the foregoing statement of fact which exist without substantial controversy or genuine issue, and upon the issues of law as above stated, the Court makes the following

## Conclusions of Law

■ I. The judgment in Case No. 283 was and is a final judgment as to the matters put in issue, litigated and determined in Case No. 283.

■ II. The gravamen of the present action is to determine whether or not the defendant exceeded his lawful authority by the expulsion and exclusion with the use of physical and military force by the defendant, in *executing* individual Exclusion Order No. V–7.

The gravamen of Case No. 283 was to determine whether or not the defendant had substantively and procedurally exceeded his lawful authority in *making* individual Exclusion Order No. V–7.

The present action is thus on a different claim and cause of action, to wit, damages, than Case No. 283, which was a suit for injunction, and the judgment therein was in effect a declaratory judgment declaring said exclusion order to be valid. The facts and events upon which the present claim for damages is founded occurred subsequent to the trial and order for Judgment in Case No. 283.

The right of the defendant to expel the plaintiff from his home in the State of California by physical and military force and to exclude him by physical and military force from Military Areas Nos. 1 and 2 (which included the States of California, Arizona, Oregon and Washington) in execution of said individual exclusion order, and his actual expulsion and exclusion, were not put in issue, or litigated, or determined, in or by the judgment in, said Case No. 283.

The plaintiff is not estopped under the doctrine of res judicata[2] by the judgment or any of the orders or proceedings in case No. 283, from filing and maintaining the instant suit for damages, insofar as the claim or cause of action is based on the expulsion and exclusion by physical and military force from Military Areas Nos. 1 and 2.

■ III. Said case No. 283 is res judicata as the matters herein involved which were actually put in issue, litigated, and determined in, or by the judgment in said case No. 283, which matters cover all the substantive and procedural grounds of invalidity herein asserted by the plaintiff as to the making, and manner of making, said individual Exclusion Order V–7, and all of the acts and things done by or under the direction of Defendant prior to the 4th day of September, 1943; and the plaintiff in the within case is estopped from attacking the validity of said Individual Exclusion Order No. V–7, and is also estopped from asserting any claim for damages for any of the acts and things done or directed by the defendant prior to the 4th day of September, 1943.

■ IV. The said individual Exclusion Order was not a self-executing order.[3]

The defendant as Commanding General of the Western Defense Command did not have the lawful power or authority to expel or exclude the plaintiff by the use of physical and military force from Military Areas No. 1 and 2. Law 503 was a limitation on the power of the Military Commander to use physical or military force to execute individual exclusion orders promulgated under Executive Order 9066, and was intended to be and was and is the exclusive means of enforcing such orders.[4]

---

[2] Cromwell v. County of Sac, 1876, 94 U.S. 351, 24 L.Ed. 195; Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; West Coast Life Insurance Co. v. Merced, 9 Cir., 1940, 114 F.2d 654, certiorari denied Pacific Nat. Bank of San Francisco. v. Merced Irr. Dist., 311 U.S. 718, 61 S.Ct. 411, 85 L.Ed. 467; Bowles v. Capital Packing Co., 10 Cir., 1944, 143 F.2d 87.

[3] Alexander v. DeWitt, 9 Cir. March 10, 1944, 141 F.2d 573.

[4] See Ochikubo v. Bonesteel, D.C., 60 F.Supp. 916, decided by this Court June 1, 1945. The reasons for the conclusions therein expressed were set forth at length and it would serve no useful purpose to repeat them here, as no new or different propositions of law on this point were presented in the extensive briefs and arguments had in this matter than were presented, tried, briefed, argued, considered, and decided there, except the proposition which was touched on argument, but not briefed—that plaintiff was at lib-

**V.** In all of the acts and things done by or under the direction of the defendant De Witt, as aforesaid, he acted in good faith and with the highest motives, and with an honest belief that Executive Order 9066 and Law 503 empowered him to lawfully do and direct such acts and things; that his acts of expulsion and exclusion of the plaintiff by physical and military force, as aforesaid, was previously authorized, and subsequently ratified and approved by his military superiors; that none of said acts or things so done or directed by said defendant were done or directed to be done with any personal malice, or personal caprice, toward said plaintiff, or with any personal desire on the part of said defendant to arbitrarily, or illegally, or tortiously, or recklessly, or oppressively affect or disregard any of the rights and privileges of the plaintiff; but the expulsion and exclusion of the plaintiff with and by the use of physical and military force as aforesaid were nevertheless beyond and in excess of and contrary to the lawful authority and scope of the legal powers of the defendant as Commander in Chief of the Western Defense Command and Fourth Army of the United States, and the said defendant by reason whereof is liable in damages to the plaintiff.[5]

**VI.** The defendant is not liable for exemplary or punitive damages.[6]

**V.II.** The value of the rights of the plaintiff involved in Case No. 283 was put in issue in that case by a direct allegation of jurisdictional amount in paragraph II of the complaint, which was denied by paragraph I of the defendant's answer therein; and the allegations of value of such rights in excess of the jurisdictional amount contained in paragraph XIV of the complaint in Case No. 283 were admitted by defendant in paragraph XI of his answer in that case, except that he denied that execution of said orders (The Exclusion and Stay Orders) *up to that time* had damaged the plaintiff in excess of the sum of $3,000.

The matter in controversy in case No. 283 was the set of constitutional rights of plaintiff claimed to be abridged by the *making* of Exclusion Order V–7.

The same set of rights are alleged in this case to have been abridged by the *execution* of said order by physical and military force.

The admissions in defendants' answer and the finding in Case No. 283, "That the matter in controversy exceeds, exclusive of interests and costs, the sum or

---

erty on bail in the sedition case, and thus in technical custody of the Courts, and that the execution of the Exclusion Order was actually a seizure of the person of the defendant by the Military from the Civil Branch of the Government. Inasmuch as it was not briefed, I consider it abandoned. Moreover, a decision on it would not change the conclusions here reached.

5 Little v. Barreme, 1804, 2 Cranch 170, 2 L.Ed. 243; The Charming Betsy, 1804, 2 Cranch 64, 2 L.Ed. 208; Wise v. Withers, 1806, 3 Cranch 331, at 337, 2 L.Ed. 457; Gelston v. Hoyt, 1818, 3 Wheat. 246, 4 L.Ed. 381; Tracy v. Swartwout, 1836, 10 Pet. 80, 9 L.Ed. 354; Mitchell v. Harmony, 1851, 13 How. 115, 136, 14 L.Ed. 75; Bates v. Clark, 1877, 5 Otto 204, 209, 95 U.S. 204, 209, 24 L.Ed. 471; Beckwith v. Bean, 1878, 8 Otto 266, at 276, 98 U.S. 266, at page 276, 25 L.Ed. 124; See also Ex parte Milligan, 1866, 4 Wall 2, 18 L.Ed. 281, and Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L. Ed. 375, and Duncan v. Kahanamoku, 66 S.Ct. 606, for general discussions of the

extent of and limitations upon the power of the Military.

In the much discussed case of Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F.2d 135, 118 A.L.R. 1440, certiorari denied 305 U.S. 643, 83 L.Ed. 414, cited by the defendants, the Court recognizes the general rule that the test of liability is whether or not one *exceeds* the authority grants by law, and bases its decision on the proposition that the acts of the defendants there involved were *within* their lawful authority, whereas, in the instant case, it is my conclusion that the defendant *exceeded* his lawful authority. Crowell v. McFadon, 1814, 8 Cranch 98, 3 L.Ed. 499; Martin v. Mott, 1827, 12 Wheat. 19, 6 L.Ed. 537; Luther v. Borden, 1849, 7 How. 1, 12 L.Ed. 581; Spalding v. Vilas, 1896, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780; and Moyer v. Peabody, 1909, 212 U.S. 78, 29 S.Ct. 235, 53 L. Ed. 410; likewise all turn upon the proposition that the acts complained of were within the legal authority of the actors.

6 The Charming Betsy; Tracy v. Swartwout; and Beckwith v. Bean, supra footnote 4.

value of $3,000.00" is res judicata that such constitutional rights are valued in excess of $3,000, exclusive of interests and costs. It thereby follows that the loss of them by the *making* of the order damaged the plaintiff more than $3,000.00. But the Court there held that the *making* of such orders was lawful and constitutional. Thus, whatever loss of those rights the plaintiff suffered as a result of the *making* of such order, it was damage without legal injury.[7]

█ That a person suffers a loss in being designated as a person who is so dangerous that his presence cannot be tolerated anywhere in an area as large as the States of California, Arizona, Oregon and Washington, cannot be denied. That such a loss was of a value in excess of $3,000.00 was decided in case No. 283, and that finding is res judicata and binding here, so far as it affects the jurisdictional amount in this case.

While the rights of the plaintiff involved here are the same rights as were involved in Case No. 283, the act of the defendant which injured or affected these rights is a different act than the acts of the defendant involved in Case No. 283. So that, the same rights as affected by the *making* of the individual exclusion order, having been held to be of the value in excess of $3,000, then, the same rights as affected by executing the same order by physical and military force are of the value in excess of $3,000. Thus the loss of the rights of the plaintiff suffered by him by his expulsion and exclusion by physical and military force in the manner hereinabove set forth, exceeded $3,000 in value, exclusive of interests and costs.

█ Precisely what that damage was to those rights, and what elements enter into their measure, need not be determined here, as it is certain that an actual cash loss is an element.[8] And the plaintiff has filed an undenied affidavit that his actual cash loss was $100, and has filed a waiver of damages in excess of that sum.[9]

VIII. That the plaintiff is entitled to judgment against the defendant in the sum of $100 as damages, and it is so ordered

---

[7] Whatever a State can or cannot do to abridge the privileges of National Citizenship (cf. Edwards v. People of State of California, 1941, 314 U.S. 160, 62 S. Ct. 164, 86 L.Ed. 119) the National Government can do so under its war powers, as evidenced, for instance by the Selective Service Law, which certainly abridges the right of free movement and choice of a place to stay, reedom of assemblage, to earn a livelihood, to engage in the occupation of one's choice and to be free from unreasonable seizure, which are among the constitutional rights asserted to be abridged in this case to the plaintiff's damage. But the law which abridges those rights must provide due process, which the Supreme Court has held was done in the Selective Service Law. I do not reach the constitutional question as to whether or not the expulsion and exclusion of the plaintiff by physical and military force, in execution of an exclusion order, lawfully made violates due process, for the reason that, in my view, Executive Order 9066 and Law 503, which must be construed together, do not make a grant of, or indicate an intention of Congress to grant power to execute such exclusion orders by physical and military force, but preserved due process in a criminal prosecution under Law 503, as the exclusive means of enforcing exclusion orders. See Ochikubo v. Bonesteel, foot note 3, supra.

[8] For measure of damages, see Beckwith v. Bean, 1878, 8 Otto 266–276, 98 U. S. 266–276, 25 L.Ed. 124.

[9] If it were not for such waiver and undenied showing, it is conceivable that the question of actual damages would have to be submitted to trial by court or jury.